**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WENDELL H. BERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 7922 |
| | ) | |
| BCS FINANCIAL CORPORATION; | ) | |
| SUPPLEMENTAL RETIREMENT PROGRAM | ) | |
| FOR CERTAIN EMPLOYEES OF BCS FINANCIAL | ) | |
| CORPORATION; and BCS FINANCIAL | ) | |
| CORPORATION APPEALS COMMITTEE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff, Wendell H. Berg ("Berg"), filed a four-count complaint against Defendants BCS Financial Corporation ("BCS"), BCS Financial Corporation Appeals Committee (the "Appeals Committee"), and the Supplemental Retirement Program for Certain Employees of BCS Financial Corporation (the "Plan Defendant").[1] Berg brings Counts I and II against all Defendants alleging that each is liable under ERISA Section 502(a)(1)(B) for wrongly denying benefits due under the SRP. Count III, brought against BCS only, seeks statutory penalties under ERISA Section 502(c) for BCS's alleged failure to comply with certain federal regulations. Count IV, also brought against BCS only, asserts a state law breach of contract claim alleging that BCS failed to perform its obligations under its employment agreement with Berg.

---

[1] When referring to the provisions of the Supplemental Retirement Program for Certain Employees of BCS Financial Corporation (as opposed to the legal entity by that name which is a Defendant), the Court will refer to it as the "SRP."

BCS and the Appeals Committee (together "Defendants") move to dismiss Counts I and II under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, and BCS moves to dismiss Count III on the same basis. BCS further moves, under Federal Rule of Civil Procedure 12(b)(1), to dismiss Count IV for lack of subject matter jurisdiction. The Plan Defendant answered the Complaint. For the reasons set forth below, Defendants' Motion to Dismiss (the "Motion") is granted in its entirety.

## BACKGROUND

For purposes of this Opinion, the Court accepts the following allegations as true.

## I.     Berg's Employment with BCS

On March 16, 1982, BCS hired Berg as Vice-President and General Counsel. At the time of his resignation, just over 21 years later, Berg served as BCS's Executive Vice-President, General Counsel and Secretary and as Executive Vice-President, General Counsel and Secretary and a Director of BCS Insurance Company and BCS Life Insurance Company, which are subsidiaries of Defendant BCS. (R. 1-1; Compl. at ¶ 10.) For the last fifteen years of his tenure, Berg worked under Edward Baran, BCS's Chairman, President and Chief Executive Officer. (*Id.* at ¶ 12.) Baran retired from BCS on March 31, 2003, the same date as Berg's last day of employment. (*Id.*) Daniel Ryan, a Vice President with BCS since 1980, succeeded Baran as BCS's President and CEO. (*Id.* at ¶ 13.)

In 1998, Berg entered into an employment agreement (the "Employment Agreement") with BCS, (*id.* at ¶ 11), which set forth the terms of Berg's employment, including his base salary, (*id.* at ¶ 14), and further described the employee benefit plans in which Berg was eligible to participate, including the SRP. (*Id.* at ¶ 15.) The Employment Agreement also described the

payments Berg would receive upon his termination.  (*Id.* at ¶¶ 20-27.)  Specifically, under

Section 6(a), if Berg's employment "terminate[d] by reason of:  (i) resignation. . . without Good

Reason. . ., or (ii) termination by the Company For Cause[2]. . . then [BCS] shall pay [Berg] his

base salary through the termination date plus all accrued vacation and any unreimbursed

expenses as of [his] Termination Date."  (R. 7-1; Defs.' Mot. to Dismiss Compl. Ex. B at ¶ 6.)[3]

Section 6(b), in contrast, provides that if Berg's "employment terminates by reason of:  (i)

termination by [BCS] without Cause, [or] (ii) resignation by [Berg] within six (6) months after

an event constituting Good Reason[4] occurs. . . then [BCS] shall pay [Berg]. . . in addition to the

amounts described in Section 6(a). . . a severance allowance (the 'Severance Amount'). . . in the

amount of two (2) times the sum of (i) [Berg's] regular Base Salary as of [his] Termination Date,

(ii) the Amount payable on an annual basis to [Berg] pursuant to Section 4(d) [*i.e.* the executive

---

[2]     Section 6(c) Employment Agreement states, among other things, that Berg could
be terminated "for Cause" if he:  (1) violated a significant company policy (e.g. falsification of
records) or his willful and deliberate failure to perform the duties and responsibilities of his
employment; (2) committed fraud, misappropriation, or embezzlement; or (3) breached any
obligation set forth in Section 8 of the Employment Agreement.  (*Id.* at ¶ 25; R. 7-1; Defs.' Mot.
to Dismiss Compl. Ex. B at ¶ 6.)

[3]     Defendants attached as exhibits to their Motion the SRP and the Employment
Agreement at issue.  Because both documents are identified in the Complaint and central to
Plaintiff's claims, the Court can properly consider them at this juncture even though Berg did not
attach those documents to his Complaint.  *See Venture Associates Corp. v. Zenith Data Sys.
Corp.,* 987 F.2d 429, 431 -432 (7th Cir. 1993) ("Documents that a defendant attaches to a motion
to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint
and are central to her claim.").  The administrative record that Defendants filed separately with
the Court, however, is not central to Plaintiff's claim and thus the Court will not consider it.

[4]     Section 6(d) of the Employment Agreement defines "Good Reason" for
resignation to mean resignation because of:  (i) the material reduction in job responsibilities, (ii)
a Change in Control, (iii) a geographical transfer, (iv) a reduction in salary, (v) a substantial
reduction in incentive compensation plans, and (vi) BCS's breach of any material term of the
Employment Agreement.  (R. 7-1; Defs.' Mot. to Dismiss Compl. Ex. B at ¶ 6.)

allowance discussed below]. . .” along with certain other amounts that are not at issue here.[5]  (R.

7-1; Defs.’ Mot. to Dismiss Compl. Ex. B at ¶ 6.)  BCS and Berg agreed that “payment of two-

thirds of the Severance Amount. . . shall be made by [BCS] in consideration of the covenants of

[Berg] contained in Section 8. . .,” which, in turn, contains non-compete and non-solicitation

clauses, and a clause prohibiting Berg from revealing BCS’s proprietary information.  (*Id.* at ¶¶

6, 8.)  BCS was not obligated to pay the remaining one-third of the Severance Amount unless

Berg executed a waiver and release of claims against BCS, which he did on February 28, 2003.

(R. 1-1; Compl. at ¶ 23.)  In addition, Section 6 of the Employment Agreement also provides that

upon termination without Cause, BCS would have to pay “matching and catch-up contributions”

to Berg’s 401(k) plan.  (*Id.* at ¶ 22; R. 7-1; Defs.’ Mot. to Dismiss Compl. Ex. B at ¶ 6(b)(y).)

### A.    Berg’s Rights Under Section Four of the Employment Agreement

Pursuant to Section 4 of the Employment Agreement, Berg received a monthly allowance

(initially, $1,000 per month) to cover, among other things, the costs of Berg’s country club

monthly dues.  (R. 1-1; Compl. at ¶ 16; R. 7-1; Defs.’ Mot. to Dismiss Compl. Ex. B at ¶ 4.)  At

his departure, Berg’s executive allowance had increased to $2,000 per month.  (R. 1-1; Compl. at

¶ 16.)  Beyond the strict terms of this contract provision, BCS typically reimbursed its executives

for country club capital and operating assessments pursuant to Section 4 of the Employment

Agreement, at the discretion of BCS’s Chairman, President, and CEO.  (*Id.* at ¶ 17; *cf.* R. 7-1;

Defs.’ Mot. to Dismiss Compl. Ex. B at ¶ 4.)  For instance, in March 2002, Cress Creek Country

---

[5]     These other amounts are “the target annual Incentive Award that would have been
paid to [Berg] for the fiscal year in which the Termination Date occurs” and “the target long-
term Incentive Award that would have been paid to [Berg] for the plan cycle ending with the
year in which the Termination Date occurs.”  (R. 7-1; Defs.’ Mot. to Dismiss Compl. Ex. B at ¶
6.)

Club ("Cress Creek") offered Berg a membership conditioned upon Berg agreeing either to execute a promissory note for a $25,000 "building fund obligation" (which Cress Creek advised would likely be called for payment within six months) or pay $24,000 currently in full satisfaction of that obligation. (R. 1-1; Compl. at ¶ 18.) Baran, then BCS's Chairman, President and CEO, agreed on behalf of BCS that Berg should pay $24,000 currently to satisfy the obligation. (*Id.* at ¶ 19.) Berg received and endorsed a BCS check directly to Cress Creek to satisfy the building fund obligation. (*Id.*) One year later, due to a delay in building, Cress Creek returned $22,000 of that assessment to Berg. (*Id.*) Two months later, in May 2003, Cress Creek reassessed the $22,000 building fund obligation, which Berg promptly repaid. (*Id.*) Berg did not retain any of the monies given to him to cover the building fund obligation. (*Id.*)

### B. Berg Participated in BCS's Supplemental Retirement Program

At some point, the Complaint does not allege when, Berg enrolled in BCS's SRP. (*Id.* at ¶ 68.) The SRP describes its purpose as:

> [P]rovid[ing] benefits for employees of [BCS] whose benefits under the Retirement Program are restricted by the limitations of Section 401(a)(17) and 415 of the Internal Revenue Code ("Code"). Accordingly, that part of the Supplemental Program that provides in excess of the limitations of benefits in Code section 415 shall constitute an "Excess Benefit Plan," as defined by 3(36) of the Employment Retirement Income Security Act, as amended ("ERISA"), and that part of the Supplemental Program that provides benefits based on compensation in excess of the compensation limitation in Code section 401(a)(17) shall constitute a plan that is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees within the meaning of sections 201(2), 301(a)(3) and 401(a)(1) of Title I of ERISA. It is intended that the Supplemental Program remain at all times an unfunded program.

(R. 7-1; Defs.' Mot. to Dismiss Compl. Ex. A at 1.)

It is unclear from the Complaint and the SRP how the Plan calculates the SRP benefits amount. The controlling section, Section 2.2 (defining the "Amount of Excess Benefit"), states

only that the Participant's benefit shall be the "Actuarial Equivalent" of the amount of benefit payable to the participant under the Retirement Program. (R. 7-1; Defs.' Mot. to Dismiss Compl. Ex. A at ¶ 2.2.) The Complaint does not indicate how benefits are administered under the Retirement Program. Apparently, the amount of Berg's "annual earnings" factors into the calculation of SRP benefits. (R. 1-1; Compl. at ¶ 47.)

In any event, Section 3.2 of the SRP grants ample discretion to the Plan Administrator in administering benefits under the Plan: "The Administrator shall administer the Supplemental Program in accordance with its terms and purposes and shall have authority to interpret the Supplemental Program, to make any necessary rules and regulations, and to determine benefits under the Supplemental Program." (R. 7-1; Defs.' Mot. to Dismiss Compl. Ex. A at ¶ 3.2.) Likewise, the Plan Administrator maintains discretion under Section 2.9 of the SRP, which sets forth the conditions that can cause a forfeiture of benefit: "the amounts to which a Participant. . . would be entitled under this Supplemental Program shall be forfeited if (i) the Participant is discharged from Employment with [BCS] for acts which, in the sole judgment of the Administrator, constitute embezzlement of funds, or (ii) the Participant's Employment terminates by dismissal for cause and the circumstances surrounding such dismissal are such that the Administrator, in its sole discretion, determines that forfeiture of the benefit otherwise payable under the Supplemental Program is warranted." (*Id.* at ¶ 2.9.)

### C. The Events Surrounding Berg's Departure

In 2002, Baran informed Berg that he and the BCS Board of Directors had agreed that Baran would retire at the end of 2002. (R. 1-1; Compl. at ¶ 30.) Among the executives seeking to succeed Baran were Berg and Ryan. (*Id.*) The Board opted to promote Ryan. (*Id.* at ¶ 31.)

Thereafter, on February 10, 2003, BCS's Executive Committee unanimously authorized Berg to resign for Good Reason and BCS to terminate his employment without Cause, as defined in Sections 6(b) and (d) of the Employment Agreement.  (*Id.* at ¶ 32.)  That same day, Baran circulated to the BCS Board of Directors a memorandum explaining what prompted the Executive Committee's action:  "[a]s you know, Wendell [Berg] and Dan [Ryan] have philosophical differences such that neither would want, nor would it be advisable for one to work for the other after I leave. . . Wendell and Dan have asked for an early decision on the matter so that an orderly process can take place in a manner that will permit Wendell to exit on March 1st with dignity."  (*Id.* at ¶ 33.)  Baran further explained that the Executive Committee voted unanimously to allow Berg to resign for Good Reason and to terminate him without Cause and requested that the Board of Directors affirm the Executive Committee's determination at the next board meeting.  (*Id.*)

On February 28, 2003, the Board of Directors held a special telephonic meeting and unanimously ratified the Executive Committee's action, thus authorizing Berg to resign with Good Reason and to terminate him without Cause.  (*Id.* at ¶ 34.)  Berg did not attend this meeting, but Baran did, filling in as secretary due to the absence of the Board of Directors' usual secretary.  (*Id.* at ¶ 35.)  After the meeting, Baran gave his handwritten notes from the meeting to Berg and asked Berg to draft the minutes for the Board of Directors based on those notes.  Berg did so, and Baran reviewed, approved and signed the minutes as drafted by Berg.  (*Id.*)  Berg then forwarded the approved minutes to another BCS employee, Ms. Sandra Strutz (whom the Board subsequently elected as BCS's Secretary), assuming that she would circulate these

minutes to the Board of Directors prior to the March 2003 meeting for the Board's approval.[6] (*Id.* at ¶ 36.)

Also on February 28, 2003, Baran issued a bulletin to all BCS employees stating that Berg "has done an outstanding job in every area I have asked him to handle and has been very instrumental in helping to build BCS Financial into the successful company that it is today. Please join me in thanking [Berg] for a job well done." (*Id.* at ¶ 39.)

Around the same time, Ryan sent a letter to Mr. James Mead, BCS's new Chairman, stating that he believed the minutes of the February 28, 2003 Board meeting, as approved and signed by Baran, did not correctly reflect the terms of Berg's separation. (*Id.* at ¶ 40.) Ryan enclosed alternative minutes, which stated that he did not believe Berg could adequately fulfill his job duties going forward after Ryan assumed his role as CEO and that a planned reorganization likely would diminish Berg's duties. (*Id.*) Ryan's draft minutes also granted him the power to investigate whether any facts or circumstances existed that would allow BCS to determine that Berg breached his obligations under his Employment Agreement. (*Id.*) Berg did not learn that these alternative minutes existed until the administrative review of his claim for terminated benefits under the SRP. (*Id.* at ¶ 41.)

After his departure, BCS did not pay Berg any matching or catch-up contributions to his 401(k) plan as described in Paragraph 6(b)(y) of the Employment Agreement, (*id.* at ¶ 42); nor did BCS pay Berg the non-cash perquisites described in the Termination Memorandum. (*Id.* at ¶ 43.)

---

[6] At some point before Berg's departure, Baran authored a "Termination Memorandum" outlining certain "non-cash perquisites" that Berg was entitled to receive in connection with the Employment Agreement. (*Id.* at ¶ 37.)

## II. The First Benefits Denial

After leaving BCS, Berg began receiving a monthly benefit under the SRP of $14,388.63. (*Id.* at ¶ 44.) He also received $5,139.37 from his qualified pension. (*Id.*) On December 19, 2003, however, BCS informed Berg that he had received a $17,384 overpayment in benefits. (*Id.* at ¶ 46.) On January 6, 2004, BCS notified Berg that his earnings for purposes of calculating his SRP benefits were incorrect due to the alleged over-inclusion of his $2,000 monthly allowance in his annual earnings. (*Id.* at ¶ 47.) BCS further notified Berg that, going forward, it would reduce his benefits to correct this error. (*Id.*) Thereafter, on January 27, 2004, BCS again contacted Berg to inform him that it planned to further reduce his benefits because his earnings improperly included monies he received for his membership with Cress Creek. (*Id.* at ¶ 48.)

On March 18, 2004, Berg's counsel requested "certain plan documents and other information related to BCS's adverse benefits determinations. . ." (*Id.* at ¶¶ 48-51.) BCS responded, at least to some extent, to Berg's request. (*Id.* at ¶ 52.) On April 14, 2004, Berg filed a written request for review of BCS's adverse benefits determinations, alleging that his SRP benefits should include income from both his Cress Creek building fund reimbursement and his $2,000 monthly allowance. (*Id.* at ¶ 54.) On May 25, 2004, the BCS Appeals Committee denied Berg's appeal, adopting the bases for denial outlined in BCS's previous correspondence with Berg on the issue. (*Id.* at ¶ 55.)

## III. The Second Benefits Denial

On May 26, 2004, BCS's General Counsel sent Berg a letter informing him that BCS was terminating all future benefits under the SRP. (*Id.* at ¶ 58.) BCS made this decision after determining from its investigation that Berg had engaged in certain conduct that met the

standards for "Forfeiture of Benefit" under Section 2.9 of the SRP. (*Id.*) In a separate letter, BCS's counsel informed Berg that, based on the same conduct, he met the definition of termination "for Cause" under the Employment Agreement and that, as a result, BCS would not make any further severance payments. (*Id.* at ¶¶ 59, 60.)

On July 15, 2004, Berg requested a review of BCS's termination of SRP benefits. (*Id.* at ¶ 61.) Along with his request for review, Berg requested documents "related to his participation in the SRP and BCS' decision to terminate his benefits. . ." (*Id.*) BCS eventually responded, at least to some extent, to Berg's request for documents. (*Id.* at ¶ 62.)

On October 22, 2004, the BCS Appeals Committee denied Berg's claims appeal and affirmed the total denial of SRP benefits. (*Id.* at ¶ 63.) The Appeals Committee rested its decision, for the most part, on the bases set forth in BCS's previous correspondence with Berg on this issue. (*Id.*)

## ANALYSIS

## I.    Legal Standard

### A.  Rules 12(b)(6) and 12(b)(1)

Defendants' motion to dismiss is based on Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). A Rule 12(b)(6) motion tests the sufficiency of a complaint. It is not designed to resolve the case on the merits. *Petri v. Gatlin,* 997 F. Supp. 956, 963 (N.D. Ill. 1997) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 294 (2ᵈ ed. 1990)). When determining whether to grant a 12(b)(6) motion to dismiss, a court must accept all factual allegations in the complaint as true. *Jang v. A.M. Miller & Assocs.,* 122 F.3d 480, 483 (7ᵗʰ Cir. 1997). A court must also draw all reasonable inferences in the plaintiff's favor. *Id.* A

court should dismiss a complaint under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984). A plaintiff cannot satisfy federal pleading requirements, however, merely by attaching bare legal conclusions to narrated facts, which fail to outline the basis of their claims. *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir. 1991).

Regarding 12(b)(1) motions, the standard of review depends upon the purpose of the motion. *See Freiburger v. Emery Air Charter, Inc.*, 795 F. Supp. 253, 255-56 (N.D. Ill. 1992). "There are two types of challenges to jurisdiction which may be made: first, a facial attack that the allegations of jurisdiction in the pleadings are facially insufficient to demonstrate the existence of jurisdiction; and second, a factual attack challenging the truth of the jurisdictional facts plaintiff alleged in the pleadings." *Id.* at 255. "In the first type of jurisdictional challenge, the standard applied to a 12(b)(1) motion is similar to the standard applied to a 12(b)(6) motion; namely, the court must take all of plaintiff's allegations as true and must view them, along with all reasonable inferences therefrom, in the light most favorable to plaintiff." *Id.* (internal citation omitted); *see also United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2002). "If, however, the motion denies or controverts the truth of the jurisdictional allegations, the court may properly 'look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Buckley v. County of Dupage,* No. 88 C 1939,1998 WL 832641, *2 (N.D. Ill. Nov. 23, 1998) (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993)); *see also United Phosphorus*, 322 F.3d at 946. The court may weigh the conflicting evidence to

establish a factual predicate upon which it can conclude whether subject matter jurisdiction exists. *See Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979). Motions that dispute whether claims derive from a common nucleus of operative facts challenge the sufficiency of the jurisdictional allegations and are thus governed by the former as opposed to latter standard of review. *See Freiburger*, 795 F. Supp. at 257.

###### B. ERISA Claims for Benefits

In Counts I and II of his Complaint, Berg brings claims under ERISA Section 502(a)(1)(B) against the Plan Defendant, BCS, and the Appeals Committee. That section provides that "[a] civil action may be brought – (1) by a participant or beneficiary [ ] (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Generally, the Seventh Circuit limits a Section 502(a)(1)(B) claim for benefits to a suit against the plan as an entity. *See Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan*, 378 F.3d 669, 674 (7th Cir. 2004); *see also Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 872 n.4 (7th Cir. 2001) ("We have continually noted that 'ERISA permits suits to recover benefits only against the Plan as an entity.'") (quoting *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1490 (7th Cir. 1996)); *Witowski v. Tetra Tech, Inc.*, 38 F. Supp. 2d 640, 644 (N.D. Ill. 1998); *Hupp v. Experian Corp.*, 108 F. Supp. 2d 1008, 1013 (N.D. Ill. 2000); *Fortmann v. Avon Prods., Inc.*, No. 97 C 5286, 1999 WL 160258, *4 (N.D. Ill. Mar. 9, 1999). Accordingly, a plaintiff typically should not bring a claim under 502(a)(1)(B) against an employer or a claims evaluator. *See Blickenstaff,* 378 F.3d at 674 (a claim for benefits under Section 502(a)(1)(B) "generally is limited to a suit against the Plan, not an employer. . . or claims evaluator. . ."); *see*

*also Moffat v. Unicare Health Ins. Co.*, 352 F. Supp. 2d 873, 879 (N.D. Ill. 2005) (recognizing that *Blickenstaff*'s language was not an express holding because the plaintiff had waived any argument regarding proper defendants under Section 502(a)(1)(B), but further noting that the same language supports the proposition that merely being active in deciding claims does not transform an entity into a proper defendant). This general rule applies equally when the plan at issue is an unfunded top hat plan. *See Garratt v. Knowles*, 245 F.3d 941, 949 (7th Cir. 2001) (suit to recover benefits under unfunded top hat plan should be brought against only the plan).

Courts in this Circuit, however, have recognized certain narrow exceptions to this general rule. Where a non-plan entity is "closely intertwined" with the plan, for example, a suit against that non-plan entity may be proper. *See, e.g., Mein v. Carus Corp.*, 241 F.3d 581, 585 (7th Cir. 2001) (where employer was the plan administrator, the employer had designated itself as agent for service of process, and most of the communications with plaintiff regarding benefits were on the employer's stationery, ERISA benefits action against employer proper because it was "closely intertwined" with the plan); *Riordan v. Commonwealth Edison Co.*, 128 F.3d 549, 551 (7th Cir. 1997) (declining to hold employer a wrong party to ERISA benefits action where the "exact relationship between [the company] and the plan is not clearly set out, [t]he plan documents themselves refer to [the company] and the plan nearly interchangeably, and the company designated itself as the plan's agent for service of process"); *cf. Garratt*, 245 F.3d at 949 n.7 (finding *Mein* inapplicable and holding that ERISA suit was improperly brought against the employer's board of directors and attorney because "*Mein* does not suggest that it would be proper for a plaintiff seeking benefits to substitute individual corporate members as defendants

rather than the plan").[7]   In addition, when a plaintiff cannot identify a plan entity, or when the

plan cannot provide full relief, suits against other entities also may be proper.  *See Madaffari v.*

*Metrocall Cos. Group*, No. 02 C 4201, 2004 WL 1557966, *4-5 (N.D. Ill. July 6, 2004)

(allowing plaintiff to sue under Section 502(a)(1)(B) the insurance company who determined the

claims because the plan had no assets and there was ambiguity in determining the identity of the

plan entity); *Rivera v. Network Health Plan of Wisconsin*, 320 F. Supp. 2d 795, 798-800 (E.D.

Wis. 2004) (denying insurance company's summary judgment motion because the plan

documents were still missing and it was not clear whether the insurance company was the plan

administrator or whether any other party was necessary for complete relief to be accorded);

*Penrose v. Hartford Life & Accident Ins. Co.*, No. 02 C 2541, 2003 WL 21801214, *2-3 (N.D.

Ill. Aug. 4, 2003) (allowing plaintiff to sue insurance company when the identity of the plan

entity was unknown to the parties, even after some discovery); *cf. Moffat*, 352 F. Supp. 2d at

877-78 (recognizing that there are only limited exceptions to the general rule that plans are the

only proper parties under Section 502(a)(1)(B)).

## II.     Berg's ERISA Claims for Benefits Fail To State a Claim Against Defendants

Defendants argue that under Seventh Circuit law the Plan is the only proper defendant to

Berg' Section 502(a)(1)(B) claim for benefits and therefore the Court should dismiss Berg's

ERISA claim against them.  The Court agrees.  Berg fails to allege facts sufficient to fall under

the narrow exceptions to the general rule that the Plan is the only proper party to an ERISA

claim for benefits.  Indeed, quite to the contrary, the Complaint not only fails to allege that a plan

entity does not exist (as in *Penrose, Madaffari*, and *Rivera*), but rather specifically alleges

---

[7]        The plaintiffs in *Mein* and *Riordan* did not name the ERISA plan as a defendant.

wrongdoing on the part of the Plan as an entity.  Moreover, the Plan Defendant has answered the

Complaint, in effect, conceding that it is the proper party for Berg to sue.  *See Fortmann*, 1999

WL 160258 at *4 (dismissing non-plan entities from ERISA benefits action because "the Plan is

already a named Defendant in this case. . .").  Further, Berg does not allege that the Plan is

incapable of providing full relief (as in *Madaffari* and *Rivera*) or that it's "closely intertwined"

with either of the Defendants (as in *Mein* and *Riordan*).[8]  Based on the allegations in the

Complaint, the Plan entity is the only proper defendant under ERISA Section 502(a)(1)(B).

Accordingly, the Court grants Defendants' motion to dismiss Counts I and II.

### III.     As a Matter of Law, Berg Cannot Recover Statutory Penalties Against BCS

In Count III, Berg requests relief under ERISA Section 502(c).  That sections authorizes

plan participants, such as Berg, to bring civil actions against "plan administrators" under certain,

discrete circumstances:

> Any administrator. . . (B) who fails or refuses to comply with a request for any
> information which such administrator is required by this subchapter to furnish to a
> participant or beneficiary (unless such failure or refusal results from matters
> reasonably beyond the control of the administrator) by mailing the material
> requested. . . within 30 days after such request may in the court's discretion be personally
> liable to such participant or beneficiary in the amount of up to $100 a day from the date
> of such failure or refusal, and the court may in its discretion order such other relief as it
> deems proper.

---

[8]      Without alleging the same in the Complaint, Plaintiff, in response to Defendants'
Motion to Dismiss, asserts that BCS is "so intertwined with the SRP that is should remain as a
defendant in Counts I and II of the Complaint."  (R. 13-1; Pl.'s Resp. to Defs.' Mot. to Dismiss
at 11.)  Berg's argument on this front, however, cannot be considered by the Court.  *See
Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) ("It is a basic principle that the
complaint may not be amended by the briefs in opposition to a motion to dismiss. . .") (citing
*Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984)).  Berg's response
does not explain how exactly BCS is "so intertwined" with the Plan Defendant, hence his
argument is unpersuasive in any event.

29 U.S.C. § 1132(c).  Berg argues that the Court should impose the statutory penalty in Section

502(c) upon BCS, the SRP administrator, for failure to comply with 29 C.F.R. 2560.503-1, a

federal regulation promulgated by the Secretary of Labor.  (R. 1-1; Compl. at ¶¶ 90-95; R. 13-1;

Pl.'s Resp. to Defs.' Mot. to Dismiss Compl. at 12.)

In doing so, Berg raises the exact same argument that the Seventh Circuit confronted and

rejected in *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 406-07 (7th Cir. 1996).  In that

case, the Seventh Circuit adopted the Third Circuit's view that "because section [502(c)]

authorizes penalties only for an administrator's refusal to comply with a request for information

required to be furnished by 'this subchapter,' 29 U.S.C. § 1132(c), the sanctions imposed by that

section may not be imposed for the violation of an agency regulation."  The Seventh Circuit

further explained its adopted holding:

> In *Groves* [*v. Modified Retirement Plan*, 803 F.2d 109, 116 (3d Cir. 1986)], the Third
> Circuit rejected the contention that, by authorizing the imposition of sanctions for breach
> of duties imposed by 'this subchapter,' section [502(c)] could be read to include both the
> provisions of ERISA itself and the regulations promulgated under the statute.  Noting that
> Congress will be understood to have authorized agencies to decide what conduct will be
> penalized only if the legislature has expressly granted that power, Judge Becker, writing
> for the court, took the view that nothing in ERISA grants the Secretary of Labor the
> power to decide that plan administrators' conduct is to be penalized.  The Third Circuit
> therefore held that section [503], which sets forth only the disclosure obligations of the
> "plan," cannot authorize the Secretary to impose any obligations on the plan
> administrator or to establish that those obligations are enforceable through the sanctions
> of section [502(c)].

> We hold, therefore, that the civil penalties of 29 U.S.C. § 1132(c) do not apply to Ms.
> Wilczynski's claim against Lumbermens.

93 F.3d at 406-07; *cf. Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F.2d 618, 621-24 (7th Cir.

1987) (Section 502(c)'s statutory penalty may be imposed on plan administrators for failing to

comply with ERISA's statutory notice requirements).  Simply put, *Wilczynski* holds that, under

Section [503], the Secretary of Labor does not have the "power to decide that plan administrators' conduct is to be penalized." 93 F.3d at 406. Thus, no matter how pointedly 29 C.F.R. 2560.503-1 speaks to plan administrator conduct, it cannot form the basis for a statutory penalty under Section 502(c).

In the face of this unequivocal precedent, Plaintiff asserts that *Wilczynski* is "inapplicable" because "the claims regulations set forth in 29 C.F.R. 2560.503-1 were significantly amended in 2002 to apply for claims filed on or after January 1, 2002" and because "29 C.F.R. 2560.503-1(i)(5) and (j)(3) specifically require *the plan administrator* to provide a claimant with access to and copies of all documents and other information relevant to his claims for benefits." (R. 13-1; Pl.'s Resp. to Defs.' Mot. to Dismiss Compl. at 13.) As Plaintiff sees it:

> Berg has alleged that BCS, the SRP's plan administrator, failed to provide him with requested documents and other information related to his claim for benefits under the SRP. Because this subsection of Section 503's claims regulations specifically places a duty on *the plan administrator* to provide the information requested, and Section 502(c) permits a participant to seek civil penalties *from a plan administrator* who has allegedly violated some duty under ERISA and its regulations, Berg's claim for civil penalties is properly pled against BCS, and the motion to dismiss. . . therefore must be denied.

(*Id.* (emphasis original).)

Plaintiff's argument misses the mark. *Wilczynski* holds that 29 C.F.R. 2560.503-1 – a regulation promulgated by the Secretary of Labor under Section 503 – cannot support a claim for statutory penalties as to plan administrators. To render *Wilczynski* inapposite, the statute, not the regulation, would have to have changed. Accordingly, the Court dismisses Berg's claim for statutory penalties against BCS.

**IV.    The Court Does Not Have Supplemental Jurisdiction to Hear Plaintiff's State Law Breach of Contract Claim**

Defendants assert that the Court should dismiss Berg's state law claim for breach of contract for lack of subject matter jurisdiction. As noted above, because Defendants' Motion asserts that Berg has not sufficiently alleged a common nucleus of operative facts between his state and federal claims, the Court must construe all well-pleaded facts as true and must view them, along with all reasonable inferences therefrom, in the light most favorable to Plaintiff. *See Freiburger*, 795 F. Supp. at 255-56. Berg has failed to demonstrate that the Court has supplemental subject matter jurisdiction over his state law breach of contract claim. As a result, the Court dismisses Count IV without prejudice.

**A.    The Governing Standard for Determining Whether Supplemental Jurisdiction Exists**

Because Plaintiff's only alleged basis for federal jurisdiction is the Court's federal question jurisdiction over his ERISA claims, (R. 1-1; Compl. at ¶¶ 2, 3), Section 1367 of the Judicial Code determines whether the Court has supplemental jurisdiction over Berg's state law-based breach of contract claim. *See* 28 U.S.C. § 1367. Section 1367 permits district courts to exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III. . ." *Id.* A state law claim forms part of the same controversy if it and the federal claim "derive from a common nucleus of operative fact." *City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 165, 118 S. Ct. 523, 529, 139 L. Ed.2d 525 (1997) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S. Ct. 1130, 1338, 16 L. Ed.2d 218 (1966)). Stated differently, supplemental jurisdiction exists "if, considered without regard to

their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding. . ." *Gibbs*, 383 U.S. at 725; 86 S. Ct. at 1138. "A loose factual connection between the claims is generally sufficient" to confer supplemental jurisdiction over state law claims. *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995) (internal quotation and citation omitted).

Yet the mere fact that claims arise from an employment relationship is, by itself, insufficient to warrant the exercise of supplemental jurisdiction. *See Farr v. Continental White Cap, Inc.*, No. 90 C 4521, 1992 WL 57198, *1 (N.D. Ill. Mar. 16, 1992) (finding no common nucleus of fact between ADEA claim for constructive discharge and breach of contract claim alleging that plaintiff was entitled to a bonus under a corporate incentive plan because the "mere fact that both claims arose from [plaintiff's] employment. . . is insufficient to warrant exercise of this court's pendent jurisdiction"); *Eager v. Commonwealth Edison Co.*, 187 F. Supp. 2d 1033, 1040 (N.D. Ill. 2002) (no supplemental jurisdiction where Title VII sexual discrimination claim did not "involve the same set of facts that animated the state claim" and was so unrelated that the federal claim "would be unaffected if the [state] claims were dismissed"); *cf. Ammerman*, 54 F.3d at 424-25. Likewise, supplemental jurisdiction does not exist where the federal and state claims merely share a factual background. *See, e.g., General Auto Serv. Station v. The City of Chicago*, No. 00 C 0368, 2004 WL 442636, *12 (N.D. Ill. Mar. 9, 2004) (state law claim that provided "factual background" for federal constitutional claim was not sufficiently related to give rise to supplemental jurisdiction); *Salei v. Boardwalk Regency Corp.*, 913 F. Supp. 993, 998-99 (E.D. Mich. 1996) (noting that plaintiff's state and federal law claims all arose from defendant's efforts to collect a debt and that when "viewed from this broad perspective" the

claims shared a common set of facts, but finding no supplemental jurisdiction because "upon closer inspection, it is apparent that [p]laintiff's state and federal claims do not share any of the same 'operative facts';. . . the facts that are relevant to the resolution of [the federal claim] are completely separate and distinct from the facts that bear on [p]laintiff's state claims").  Rather, "'[o]perative fact,' as the term itself demonstrates, is a proof-oriented concept." *Prudential-Bache Secs., Inc. v. Lisle Axis Assoc.*, 657 F. Supp. 190, 195 (N.D. Ill. 1987); *see also Blue Dane Simmental Corp. v. American Simmental Ass'n*, 952 F. Supp. 1399, 1408 n.5 (D. Neb. 1997) ("Using the Gibbs formulation, the ultimate inquiry is whether the facts in the main claim and counterclaim are both 'common' and 'operative.'").

**B.      Berg's Remaining ERISA Claims Will Involve Only a Narrow Evidentiary Record**

Under these principles, it is critical to determine what are the "operative facts" underlying Berg's remaining ERISA claims – the claims requesting that the Court review two administrative denials of benefits allegedly due under the SRP.  "Decisions of ERISA plan administrators presumptively receive *de novo* review, but if the plan establishes discretionary authority then review will be deferential."  *Perlman v. Swiss Bank Corp.*, 195 F.3d 975, 980 (7th Cir. 1999) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed.2d 80 (1989)).  Where discretionary authority exists, courts apply an "extremely deferential" review that examines only whether a plan administrator's determination was "arbitrary and capricious."  *Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 607 (7th Cir. 1999) (citing *Trombetta v. Cragin Federal Bank for Savings Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996)).

Accordingly, "[d]eferential review of an administrative decision means review on the

administrative record." *Perlman*, 195 F.3d at 981-82 ("[The Seventh Circuit] ha[s] allowed

parties to take discovery and present new evidence in ERISA cases subject to *de novo* judicial

decisions, but never where the question is whether a decision is supported by substantial

evidence, or is arbitrary or capricious," but further noting that "discovery may be appropriate to

investigate a claim that the plan's administrator did not do what it said it did – that, for example,

the application was thrown in the trash rather than evaluated on the merits").  The same level of

review applies even if a plan administrator may be acting out of self-interest.  *Id.* at 981 ("a plan

administrator's self-interest does not affect the standard of review").  As with typical ERISA

plans, the "arbitrary and capricious" standard, and its concomitant limited evidentiary review,

applies to top hat plans, as well.  *Olander,* 187 F.3d at 607 (affirming application of arbitrary and

capricious review to benefits administered under a top hat plan); *see also Firestone*, 489 U.S. at

115, 109 S. Ct. at 957 (noting that its decision regarding the standard of review under ERISA

Section 502(a)(1)(B) "need not distinguish between types of plans or focus on the motivations of

plan administrators and fiduciaries").[9]

No "magic words" are required to confer discretion on an administrator.  *Donato v.

Metropolitan Life Ins. Co.*, 19 F.3d 375, 379 (7ᵗʰ Cir. 1994).  Rather, it is enough that a plan's

language "indicates with the requisite minimum clarity that a discretionary determination is

envisaged."  *Hertzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7ᵗʰ Cir. 2000); *Hightshue v.*

---

[9]      Berg argues at some length that the Court should apply a *de novo* standard of
review because the Plan at issue here is an unfunded supplemental retirement plan; this is the
standard the Third Circuit adopted in *Goldstein v. Johnson & Johnson*, 251 F.3d 433 (3d Cir.
2001).  That very opinion, however, recognizes that the Seventh Circuit does not apply this
standard.  *Id.* at 443 n.6.  As it must, the Court will apply the arbitrary and capricious standard
affirmed in *Olander*.

*AIG Life Ins. Co.*, 135 F.3d 1144, 1147 (7th Cir. 1998) ("[E]ither a grant of discretion to pay claims or a grant of discretion to construe plan terms is sufficient to trigger a deferential standard of review.").

Here, the SRP grants its administrator discretion sufficient to trigger an "arbitrary and capricious" standard of review. Indeed, both Sections 3.2 (governing benefits distribution) and 2.9 (governing forfeiture of benefits) clearly reflect that a "discretionary determination was envisaged." (R. 7-1; Defs.' Mot. to Dismiss the Compl., Ex. A at ¶ 3.2 ("The Administrator. . . shall have authority to interpret the Supplemental Program, to make any necessary rules and regulations, and to determine benefits under the Supplemental Program."); (*id.* at ¶ 2.9 ("the amounts to which a Participant. . . would be entitled under this Supplemental Program shall be forfeited if (i) the Participant is discharged from Employment with [BCS] for acts which, in the sole judgment of the Administrator, constitute embezzlement of funds, or (ii) the Participant's Employment terminates by dismissal for cause and the circumstances surrounding such dismissal are such that the Administrator, in its sole discretion, determines that forfeiture of the benefit otherwise payable under the Supplemental Program is warranted."). Because the SRP administrator has sufficient discretion to trigger the arbitrary and capricious standard, the Court's review of Berg's ERISA claims will involve only a narrow corpus of evidence.[10]

### C.     Berg's Remaining ERISA Claims and His State Law Breach of Contract Claim Do Not Derive from a Common Nucleus of Operative Fact

The narrow operative facts underlying Berg's ERISA claims do not relate to his state law

---

[10]     In addition, while Berg has alleged that Ryan personally "engaged in a campaign to terminate his benefits," Berg has not levied the same allegation against the Appeals Committee, stating only that the Appeals Committee adopted BCS's reasons for benefits denial. (R. 1-1; Compl. at ¶¶ 45-64).

breach of contract claim.  The ERISA claims here involve only whether the Appeals Committee acted arbitrarily or capriciously in denying Berg benefits under the SRP.  Thus, under *Perlman*, the Court's review will be limited to the administrative record that the Appeals Committee had before it in rendering its decision.  *Perlman*, 195 F.3d at 981-82.

But whether the Appeals Committee abused its discretion in reviewing the administrative record is not an "operative fact" as to whether BCS, a separate party, breached its obligations under an independent agreement with Berg.  *See Farr*, 1992 WL 57198 at *1; *Prudential-Bache Secs., Inc.*, 657 F. Supp. at 195; *see also Salei*, 913 F. Supp. at 999.  Furthermore, that these claims emerged out of the same factual background or from Berg's general employment relationship with BCS is insufficient.  *See General Auto Serv. Station*, 2004 WL 442636 at *12; *Farr*, 1992 WL 57198 at *1.  In sum, a dismissal of Berg's state law claim would not affect his ERISA claims.  *Eager*, 187 F. Supp. 2d at 1040.  Accordingly, Count IV is dismissed without prejudice for lack of subject matter jurisdiction.

## V.    Even If There Were a Common Nucleus Sufficient To Invoke Supplemental Jurisdiction, the Court, In Its Discretion, Would Decline To Do So

The Court would not exercise supplemental jurisdiction even assuming it did exist.  28 U.S.C. § 1367(c) governs the Court's discretion in this regard:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if– (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The "power [to adjudicate state law claims] need not be exercised in every case in which it is found to exist.  [Rather] [i]t has consistently been recognized that pendent [now supplemental]

jurisdiction is a doctrine of discretion, not of plaintiff's right." *Gibbs*, 383 U.S. at 726, 86 S. Ct. at 1139. In weighing whether to exercise supplemental jurisdiction over a state law claim, courts should factor in "considerations of judicial economy [and] convenience and fairness to litigants. . . Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.* In addition, "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." *Id.* The Seventh Circuit has "acknowledge[d] the broad discretion of district judges in making judgments concerning the retention of supplemental claims." *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997).

Here, dismissing Berg's state law breach of contract claim against BCS promotes judicial economy. BCS is not a party to the federal claims. Thus, trying this claim in state court would be as economical as trying it here. Moreover, the state law breach of contract claim will substantially predominate over the remaining federal claims. Unlike his ERISA claims, which are limited to review of an administrative record, Berg's state law breach of contract claim will involve considerably more expansive discovery. *See Vallone v. CNA Financial Corp.*, 375 F.3d 623, 629-30 (7th Cir. 2004) (where claim for wrongful denial of benefits was limited to administrative record district court abused its discretion in denying discovery as to a state law claim that was not a review of a decision of a plan administrator and, hence, not limited to the administrative record).

The Court also would decline to exercise supplemental jurisdiction in this case because

Berg's theory of breach rests, in part, on a novel theory of state law. Berg asserts that BCS breached the Employment Agreement by using "after-acquired evidence," (R. 1-1; Compl. at ¶ 102), a theory apparently premised on a doctrine originating in the employment law context. *See Von Pein v. Hedstrom Corp.*, No. 04 C 553, 2004 WL 1102317, *3-4 (N.D. Ill. May 4, 2004) (citing *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 357-58, 115 S. Ct. 879, 884 (1995)). At its core, the doctrine operates when, after terminating an employee, an employer learns that the employee engaged in conduct that would have provided a lawful basis upon which to terminate. *Id.* Under those circumstances, such "after-acquired evidence" cannot act as a complete bar to recovery to a wrongful discharge suit, but it can be admitted to limit the amount of back pay damages. *Id.* It appears that only two cases have discussed whether Illinois law (the law governing Plaintiff's breach of contract claim) recognizes this doctrine in the ordinary breach of employment contract context. *Id.* (noting that *Valentino v. Hilquist*, 337 Ill. App. 3d 461, 271 Ill. Dec. 697, 785 N.E.2d 891 (Ill. App. 2003) is the "lone Illinois appellate opinion. . . on the subject of after-acquired evidence in a breach of employment contract case. . ."). Both *Von Pein* and *Valentino* state that Illinois would not apply the doctrine in employment contract cases, but neither has done so definitively. *Id.* at *3 (noting that *Valentino*'s discussion on this point cannot be given precedential value and only "infer[ing] the Illinois Supreme Court would presently not adopt the after-acquired evidence doctrine"). Thus, Berg's novel breach of contract claim, resting as it does on this under-developed doctrine, gives the Court further reason to decline to exercise supplemental jurisdiction, assuming such jurisdiction existed in the first place.

**CONCLUSION**

Pursuant to Rule 12(b)(6), the Court dismisses Berg's claims under ERISA Section 502(a)(1)(B) (Counts I and II) to the extent those counts are directed against BCS and the Appeals Committee. The Court also dismisses Berg's claim seeking statutory penalties under ERISA Section 502(c) against BCS (Count III). Because the Court does not have subject matter jurisdiction over Berg's state law breach of contract claim (Count IV), the Court dismisses that claim without prejudice.

Dated: June 6, 2005                                          ENTERED

_____
AMY J. ST. EVE
United States District Judge