**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

WENDELL H. BERG,                                )
                                                )
                  Plaintiff,                    )
                                                )
         v.                                     )         No. 04 C 7922
                                                )
BCS FINANCIAL CORPORATION;                      )
SUPPLEMENTAL RETIREMENT PROGRAM                 )
FOR CERTAIN EMPLOYEES OF BCS FINANCIAL          )
CORPORATION; and BCS FINANCIAL                  )
CORPORATION APPEALS COMMITTEE,                  )
                                                )
                  Defendants.                   )


## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

         Plaintiff, Wendell H. Berg ("Berg"), filed suit against Defendants BCS Financial

Corporation ("BCS"), BCS Financial Corporation Appeals Committee (the "Committee"), and

the Supplemental Retirement Program for Certain Employees of BCS Financial Corporation (the

"Plan").[1] The Court has dismissed Berg's claims against BCS and the Appeals Committee.

Berg's remaining claims consist of two counts against the Plan, alleging that it is liable under

ERISA Section 502(a)(1)(B) for wrongly denying benefits due under the SRP. Berg and the

Plan have filed cross motions for summary judgment. For the reasons set forth below, the Court

and grants the Plan's motion and denies Berg's motion.

---

[1]      When referring to the provisions of the Supplemental Retirement Program for
Certain Employees of BCS Financial Corporation (as opposed to the legal entity that is the
Defendant), the Court will refer to it as the "SRP."

## ANALYSIS

### I.      Legal Standard

#### A.      Federal Rule of Civil Procedure 56

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In determining whether a genuine issue of material fact exists, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party.  *Id.* at 255.  The party seeking summary judgment must establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  To prevail, the responding party must then come forward with facts "sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial."  *Id.* at 322.  The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion.  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

These "principles apply to cross-motions for summary judgment just as they would to a garden-variety summary judgment motion."  *Steinberg v. Railroad Maint. & Indus. Health and*

*Welfare Fund*, No. 03 C 4539, 2004 WL 1151619, *2 (N.D. Ill. Apr. 13, 2004) (citing *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002)). That is to say, "the court is to evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant." *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003). Because "each motion must be assessed independently [ ] denial of one does not necessitate the grant of the other." *Local 710 I.B.T. Pension Fund v. United Parcel Serv., Inc.,* No. 02 C 4420, 2004 WL 2403123, *3 (N.D. Ill. Oct. 26, 2004) (citation omitted).

### B.     Judicial Review of ERISA Benefits Determinations

In ERISA cases like the one here, "the scope of the district court's . . . review is governed by the rule that a denial of benefits is reviewed *de novo* unless the plan gives the plan administrator discretion to construe policy terms." *See Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005) (citing *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005)); *see also Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 607 (7th Cir. 1999) (where discretionary authority exists under a "top-hat plan" like the one here, courts apply an "extremely deferential" review that examines only whether a plan administrator's determination was "arbitrary and capricious"); *Perlman v. Swiss Bank Corp.*, 195 F.3d 975, 981 (7th Cir. 1999) ("a plan administrator's self-interest does not affect the standard of review"). Here, the Court already has determined that the SRP provides ample discretion to give rise to review under the deferential arbitrary and capricious standard. *Berg v. BCS Financial Corp.*, 372 F. Supp. 2d 1080, 1092-94 (N.D. Ill. 2005). Under this "least demanding form of judicial review," *Olander*, 187 F.3d at 607, a court limits its review to the administrative record presented to the committee

3

and "will not set aside a denial of benefits based on any reasonable interpretation of the plan."

*Hess*, 423 F.3d at 658 (citing *Mers v. Marriott Int'l Group Accidental Death and*

*Dismemberment Plan*, 144 F.3d 1014, 1021 (7th Cir.1998)); *Perlman*, 195 F.3d at 981-82

("Deferential review of an administrative decision means review on the administrative record").

"This standard gives great deference to the decision of a committee which cannot be overturned

unless the committee's decision was a downright unreasonable one.  It is not the function of the

district court to decide whether it would have reached the same conclusion as the committee or

to substitute its judgment for the judgment of the committee."  *Dabertin v. HCR Manor Care,*

*Inc.*, 373 F.3d 822, 828 (7th Cir. 2004) (citation omitted).

> "But even review under this most deferential standard does not amount to a rubber stamp.

The committee must articulate a rational connection between the facts found, the issue to be

decided, and the choice made."  *Id.* (citation omitted); *Gallo v. Amoco Corp.*, 102 F.3d 918, 922

(7th Cir. 1996) ("Deferential review is not no review; deference need not be abject.").  A

committee, however, is not limited to the reasons it originally offered to the plan participant.

Rather, "[w]hen challenged in court, the plan administrator can defend his interpretation with

any arguments that bear upon its rationality.  He cannot augment the administrative record with

new facts bearing upon the application for benefits (for example, new facts concerning the

applicant's earnings or years of service), but he is not limited to repeating what he told the

applicant."  *Gallo*, 102 F.3d at 923 (citation omitted; parentheses in original) (further noting that

"[t]he district judge went astray by requiring that the plan administrator articulate the grounds

for the interpretation in the course of reviewing an adverse determination on a claim for benefits,

as if the plan administrator were an administrative agency.").  With these standards in mind, the

Court turns to the merits of the parties' motions.[2]

## II.     Background

### A.     Parties

Berg is a resident of Chicago, Illinois and participated in the SRP, which is an unfunded benefit plan maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees as described in Section 201(2) of ERISA.  (R. 34-1, Pl.'s Am. Stmt. of Material Facts ("Pl.'s SMF") at ¶¶1-2; R. 32-1, Def.'s Stmt. of Material Facts ("Def.'s SMF") at ¶2.)  BCS sponsors and administers the SRP.  (R. 34-1, Pl.'s

---

[2]     Although the parties did not raise the issue, the Court recognizes that there is at least an ostensible tension between the inferential presumptions under Rule 56 and those in play under the arbitrary and capricious standard of review.  *See, e.g., Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002) ("To be sure, there is an obvious discongruence between the two standards.  The arbitrary and capricious standard asks only whether a factfinder's decision is plausible in light of the record as a whole . . .  The summary judgment standard, however, asks whether the factfinder's decision is inevitable even when all the evidence is marshaled in the objecting party's favor and all reasonable inferences therefrom are shaped to fit that party's theory of the case . . . .").  Part of this tension may lie in the fact that "[i]n an ERISA benefit denial case, trial is usually not an option:  in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Id.*  In any event, "[s]ome [courts] have glossed over [the tension], giving lip service to the summary judgment standard but then proceeding to examine the evidence under the arbitrary and capricious standard . . .  More recently, some of these same courts have tended simply to ignore the discongruence, omitting any mention of the summary judgment paradigm and focusing exclusively on whether the fiduciary's decision passes muster under the arbitrary and capricious test."  *Id.* (citation omitted).  In *Leahy*, the First Circuit ultimately concluded that, under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989), the arbitrary and capricious standard "requires deference to the findings of the plan administrator, and, thus, even under Fed. R. Civ. P. 56, does not permit a district court independently to weigh the proof.  Rather, the district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits."  *Id.*  The Court here, however, need not resolve this issue because under any of the above permutations the result here would be the same.

SMF at ¶1, ¶18 (stating that the National Employee Benefits Administration is the SRP's administrator).)  The Court previously held that the Plan is the proper party for Berg to sue to recover benefits under the SRP.  *See Berg*, 372 F. Supp. 2d at 1090-91.

### B.    Berg's Employment with BCS

On March 16, 1982, BCS hired Berg as Vice-President and General Counsel.  (R. 32-1, Def.'s SMF at ¶6.)  At the time of his resignation – roughly 21 years later – Berg served as BCS's Executive Vice-President, General Counsel and Secretary and a Director of BCS Insurance Company and BCS Life Insurance Company, which are subsidiaries of BCS.  (*Id.* at ¶6; R. 34-1; Pl.'s SMF at ¶4.)  Berg ended his employment with BCS on March 31, 2003.  (R. 34-1, Pl.'s SMF at ¶5.)

For fifteen years prior to Berg's departure from BCS, Edward Baran ("Baran") served as the Chairman, President and Chief Executive Officer of BCS.  (*Id*. at ¶6.)  Baran retired from BCS on March 31, 2003, the same date as Berg's last day of employment.  (R. 32-1, Def.'s SMF at ¶7.)  Daniel Ryan ("Ryan") succeeded Baran as BCS's President and CEO, effective March 1, 2003.  (R. 34-1, Pl.'s SMF at ¶7.)  BCS has employed Ryan since 1980 in various capacities including Vice President, Senior Vice President, and Executive Vice President, Underwriting/Actuarial at BCS.  (*Id.*)

### 1.    The Employment Agreement

When Berg resigned, his employment with BCS was governed by an Employment Agreement.  (*Id.* at ¶5.)  The Employment Agreement specified Berg's employment responsibilities, the compensation he would receive (including his base salary, incentive compensation programs, severance payments as well as miscellaneous benefits), and the

retirement plans in which Berg was eligible to participate (including the SRP). (*Id*. at ¶8; R. 16-1, Admin. Record at FOR00222-23.)

The Employment Agreement also set forth specific events that could result in the termination of Berg's employment with BCS. (R. 34-1, Pl.'s SMF at ¶10; R. 16-1, Admin. Record at FOR00223 (providing that termination would occur upon (1) Berg's written resignation, (2) his receipt of written notice from BCS of his termination of employment, (3) his death or disability, or (4) the expiration of his employment period).) Upon termination, the amount of Berg's severance payments would vary depending on whether Section 6(c) or 6(d) of the Employment Agreement applied:

> [Section 6(c)]: "Termination by the Company For Cause" shall mean the Executive's employment termination for:
>
> (i) the Executive's violation of a significant company policy (*e.g.* falsification of records, sexual harassment policy, possession and/or use of illegal drugs) or the Executive's failure to perform the duties and responsibilities of his employment hereunder, which failure is willful and deliberate on the Executive's part and is not remedied by him in a reasonable period of time . . . after the Executive's receipt of written notice from the Company of such failure;
>
> (ii) the Executive's commission of fraud, misappropriation, or embezzlement affecting the Company;
>
> (iii) the Executive's conviction of any felony under any federal or state law;
>
> (iv) the Executive's violation of a governmental regulation that adversely affects the financial condition of the Company; or
>
> (v) the Executive's breach of any obligation described in Section 8 of [the Employment Agreement].
>
> [Section 6(d)]: "Good Reason" for resignation by the Executive shall mean his resignation because of:
>
> (i) the material reduction in the Executive's responsibilities, duties, authority, or title, or a change in the Executive's reporting responsibilities such that the Executive no longer

reports to the Chief Officer of the Board . . .

(iv) a reduction in the Executive's base salary;

(v) the elimination, substantial reduction or adverse modification of the incentive compensation plans and programs applicable to the Executive; or

(vi) the Company's breach of any material term of this Agreement, including, but not limited to, the Company's failure, after due demand, to provide or to pay the executive any of the compensation or benefits due under this Agreement . . .

(R. 34-1, Pl.'s SMF at ¶¶11-12; R. 16-1, Admin. Record at FOR00228-29.)  Berg executed the

Employment Agreement on January 28, 1998.  (R. 34-1, Pl.'s SMF at ¶5.)

## 2.  The SRP

While employed at BCS, Berg enrolled in the SRP, a plan that BCS created for its

executives in 1990.  The SRP grants discretion to the Administrator in interpreting the SRP and

determining benefits thereunder:

The Administrator shall administer the Supplemental Program in accordance with its terms and purposes and shall have authority to interpret the Supplemental Program, to make any necessary rules and regulations, and to determine benefits under the Supplemental Program . . .

(R. 16-1, Admin. Record at FOR00201 ¶3.2.)  Likewise, the Plan Administrator maintains ample

discretion under Section 2.9 of the SRP, which sets forth the conditions that can cause a

forfeiture of benefits:

[T]he amounts to which a Participant. . . would be entitled under this Supplemental Program shall be forfeited if:

(i) the Participant is discharged from Employment with [BCS] for acts which, in the sole judgment of the Administrator, constitute embezzlement of funds, or

(ii) the Participant's Employment terminates by dismissal for cause and the circumstances surrounding such dismissal are such that the Administrator, in its sole discretion, determines that forfeiture of the benefit otherwise payable under the Supplemental Program is warranted.

8

(*Id.* at FOR00201 ¶2.9.)[3]  Once the Plan Administrator, in its sole discretion, determines that forfeiture is warranted, the SRP entitles the adversely affected participant to an administrative review of the benefits denial:

> [T]he claimant may file a written request with the Administrator that it conduct a full and fair review of the denial of the claimant's claim for benefits.  In connection with the claimant's appeal of the denial of his benefit, the claimant may review pertinent documents and may submit issues and comments in writing.

(R. 32-1, Def.'s SMF at ¶9; R. 16-1, Admin. Record at FOR00203 ¶3.3.)  The SRP does not expressly incorporate or refer to the terms of Berg's Employment Agreement.

### C.    The Events Surrounding Berg's Departure

#### 1.    Berg's Version

The Administrative Record contains conflicting accounts of the circumstances surrounding Berg's termination.  Berg's version goes as follows.  On February 10, 2003, BCS's Executive Committee voted unanimously to allow Berg to resign for Good Reason and BCS to

---

[3]    Since the Court issued its motion to dismiss opinion, the Seventh Circuit has "clarif[ied] the test we are using to decide whether *de novo* review or deferential review is proper:"

> *Herzberger* [*v. Standard Ins. Co.*, 205 F.3d 327, 330 (7th Cir. 2000)] adopts the preferable approach.  There is a substantive difference between plans without discretion, for which the standard of review is de novo under [*Firestone*], and those with discretion, for which review is deferential.  The former plans reflect the fact that the applicant must meet the prescribed requirements of the plan, through appropriate evidence. . . .  The latter plans communicate the idea that the administrator not only has broad-ranging authority to assess compliance with pre-existing criteria, but also has the power to interpret the rules, to implement the rules, and even to change them entirely."

*Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635, 639 (7th Cir. 2005).  In light of the general interpretive and rule-making authority envisaged in SRP Section 3.2 and the broad discretion created under SRP Section 2.9, the Court concludes that it must review the Committee's decision under the arbitrary and capricious standard.

terminate his employment without Cause, in accordance the Employment Agreement. (R. 34-1, Pl.'s SMF at ¶15.) That same day, Baran circulated to the BCS Board of Directors a memorandum explaining the Executive Committee's action: "[a]s you know, Wendell [Berg] and Dan [Ryan] have philosophical differences such that neither would want, nor would it be advisable for one to work for the other after I leave . . . Wendell and Dan have asked for an early decision on the matter so that an orderly process can take place in a manner that will permit Wendell to exit on March 1st with dignity." (*Id.*) The Executive Committee further requested that the Board of Directors affirm the Executive Committee's determination at the next board meeting. (*Id.*) On February 28, 2003, according to meeting minutes that Berg drafted, the Board of Directors held a special telephonic meeting and unanimously ratified the Executive Committee's action:

> Chairman Baran then asked the Board to consider ratification of the Executive Committee's action taken at its meeting on February 10, 2003, to permit Mr. Berg to reign for good reason, and the termination of his employment without cause, in accordance with the terms of his Employment Agreement . . . At the conclusion of Messrs. Baran and Ryan's remarks, Mr. Glasscock made a motion to ratify the Executive Committee's unanimous action of February 10 with respect to Mr. Berg's Employment Agreement. The motion was seconded and all members in attendance voted in support thereof.

(R. 16-1, Admin. Record at FOR00295-96; R. 34-1, Pl.'s SMF at ¶16.) Berg did not attend the meeting, but rather drafted the minutes based on notes he received from Baran, who did attend the meeting. (R. 34-1, Pl.'s SMF at ¶¶76-77.) Baran signed the minutes as drafted by Berg.[4] (R. 16-1, Admin. Record at FOR00296.)

In addition, Baran, on BCS's behalf, executed a termination memorandum for Berg,

_____

[4] As discussed below, Berg concedes that he cannot personally attest to the accuracy of the minutes he drafted.

which outlined certain non-cash perquisites that the Employment Agreement purportedly entitled

Berg to receive and also sent a "transmittal letter" to the SRP's administrator, attaching Berg's

retirement notice (as well as his own).  (R. 34-1, Pl.'s SMF at ¶¶17-18.)  Baran's transmittal

letter itself makes no mention of an increase in Berg's SRP benefits, but says only the following:

> Please accept on behalf of BCS, the attached Retirement Notices for participants Wendell
> H. Berg, and Edward J. Baran, for authorization for payment of the benefits under the
> SRP and QRP, in accordance with the provisions of the Notices.

(*Id.* at FOR00108.)  Rather, the alleged authorization for eliminating the Berg's social security

offset and early retirement reduction appear exclusively in the attached Notice:

> [Berg's] Employment Contract provides 3 year severance and contract close-out earnings
> which constitute the last 3 years earnings for the 5 year average.  There  is to be no early
> retirement reduction and no Social Security offset applied to the SRP amount.

(R. 16-1, Admin. Record at FOR00109; R. 34-1, Pl.'s SMF at ¶18.)  According to Berg, Baran's

unilateral increase in benefits complied with a November 1998 Executive Committee

amendment that authorized Baran to alter Berg's SRP benefits in any manner Baran saw fit.  (R.

34-1, Pl.'s SMF at ¶61.)  Since his departure, Berg claims that Ryan has engaged in a "vindictive

campaign to change the nature of Berg's separation and to reduce and ultimately terminate

Berg's SRP benefits."  (*Id.* at ¶22.)

### 2.    The Plan's Version

The Plan cites evidence in the Administrative Record that conveys a different version of

events.  On March 26, 2003, Ryan wrote a letter to James Mead, BCS's Vice Chairman,

regarding Berg's version of the February 28, 2003 meeting minutes:

> As we discussed, I recently inquired about the status of the Minutes for the [February 28
> special telephonic meeting].  To my surprise, I was provided with a completed draft,
> apparently signed by Ed. . . .  When I received Ed's draft, I was concerned that it does not
> accurately reflect the Board's action or intent.  My understanding is that the Board agreed

to allow Wendell to resign and for the Corporation to begin making ratable payments to him pursuant to his employment contract.  Solely out of consideration for [Berg's] dignity, the Board also agreed as an accommodation to allow [Berg] to refer to his termination as "retirement."

I do not believe the Board intended to waive any rights the Corporation may have against [Berg] in the event we discover [Berg] breached his duties and obligations.  [Baran's] draft could be read to suggest that all issues regarding [Berg] are resolved.  This is inconsistent with the statements I made to the Board that if any breach of duty on [Berg's] part comes to light in the future, the facts will be reported to the Board and the Board will be free to take whatever action it deems appropriate.  Accordingly, I have enclosed a second draft of the Minutes for the meeting which, I hope, captures the Board's action and intent more accurately.

(R. 16-1, Admin. Record at FOR00297.)  In line with his letter, Ryan's draft minutes left open

the issue of whether Berg's termination was without cause:

Chairman Baran then asked the Board to consider the Executive Committee's proposal based on its meeting on February 10, 2003 in which Mr. Berg's resignation would be accepted and he would be paid severance. . . .

Mr. Ryan [ ] indicated that the Corporation did not have sufficient information at the present time, which would give rise to termination of Mr. Berg's employment for cause.  In addition, Mr. Ryan stated that if, in the future, he became aware of any facts or circumstances, which would indicate that Mr. Berg had breached his obligations under the Employment Agreement, Mr. Ryan would inform the Board of such facts and circumstances.  The Board could then avail itself of any and all appropriate action.

Thereafter, Mr. Glasscock made a motion to accept Mr. Ryan's recommendation, to fulfill the Corporation's obligation with respect to Mr. Berg's contract and, as an accommodation to Mr. Berg, allow him to announce that he was retiring.  The motion was seconded and all members in attendance voted in support thereof.

(*Id.* at FOR00298-99.)  Mead signed Ryan's draft minutes, but, contrary to the Plan's contention,

the administrative record does not indicate whether the Board of Directors subsequently adopted

Ryan's version of the meeting minutes.  (R. 43-1, Def.'s Reply in Supp. of Summ. J. at 8

(asserting that "the board of directors rejected Berg's draft minutes and approved minutes that

more accurately set forth its deliberations and decisions," but citing only the draft minutes

attached to Ryan's March 26 letter).)

**D.      The Adverse Benefits Determinations**

**1.      The May 24, 2004 Determination**

In a series of letters, the last one dated February 16, 2004, the Plan notified Berg in writing of an adverse benefit determination, which, in turn, triggered Berg's right to request review pursuant to SRP Section 3.3(b).  (R. 32-1, Def.'s SMF at ¶8.)  In response, Berg requested and received documents relevant to his claims appeal.  (*Id.* at ¶10.)  On April 14, 2004, Berg, through counsel, filed a submission to the Committee in support of his written request for review of certain initial adverse benefit determinations.  (*Id.* at ¶11.)  On May 20, 2004, BCS submitted its response to Berg's submission to the Appeals Committee.  (*Id.* at ¶12.)

On May 24, 2004, the Committee rendered its Notice of Adverse Benefit Determination on Review.  (*Id.* at ¶13.)  The Committee identified four "Specific Reasons" for reducing Berg's SRP benefits:

> (1) **Purported Elimination of Social Security Offset and Early Retirement Reduction**:  Mr. Berg's claim for SRP benefits without the social security offset and the early retirement reduction is denied because the ["Qualified Defined Benefit Plan"] and the SRP require social security offset and the early retirement reduction from benefits under the Qualified Defined Benefit Plan and the SRP and neither plan was ever amended in this regard.

> (2) **Requested "Supplemental Matching Contributions Under the SRP"**: Mr. Berg's claim for supplemental matching contributions under the SRP is denied because this benefit was never implemented pursuant to the SRP or any valid amendment thereto.  In addition, Mr. Berg's claim for such benefits is not provided for in his employment agreement . . . and he waived the claim through his "Waiver and Release Agreement" with BCS . . .

> (3) **Requested "Qualified 401(k) Plan Benefits Accrued Under the SRP During the Severance Period" and Miscellaneous Perquisites**:  Mr. Berg's claims are denied because they are not provided for nor authorized by the SRP, BCS['s]. . . "Tax-Favored Savings Plan . . . or his employment agreement . . .  Further, Mr. Berg's claims are denied

13

because he waived them through his "Waiver and Release Agreement" . . .

(4) **Alleged "Earnings" For Purposes of Qualified Pension Plan and SRP Benefits**:
Mr. Berg's Five Year Average Earnings for purposes of calculating his SRP benefits are
as follows:

| | |
|---|---|
| 2001 | $376,479 |
| 2002 | $427,199 |
| Severance Year 1 (2003) | $479,325 |
| Severance Year 2 (2004) | $479,325 |
| Severance Year 3 (2005) | $479,325 |

Mr. Berg's claims for additional amounts are denied because those additional amounts
are prohibited, contradicted and/or not authorized by the SRP, Qualified Defined Benefit
Plan, Tax-Favored Savings Plan and/or his employment agreement with BCS. Further
Mr. Berg waived claims to certain additional amounts through his "Waiver and Release
Agreement" with BCS . . .

(R. 16-1, Admin. Record at FOR00215-16; R. 32-1, Def.'s SMF at ¶22.) The Committee's

notice cited the specific SRP sections that it relied upon in making its determinations. (R. 16-1,

Admin. Record at FOR00216; R. 32-1, Def.'s SMF at ¶18; *see also* R. 32-1, Def.'s SMF at ¶15

(stating that the Committee considered all of the comments, documents, records and other

information and applied the provisions of the Plan to Berg's benefit claims).)

### 2. The October 26, 2004 Determination

On May 26, 2004, BCS issued another initial adverse benefit determination advising

Berg that the Administrator had determined that Berg met the standard for forfeiture under SRP

Section 2.9. (R. 32-1, Def.'s SMF at ¶23.) The notice advised Berg of his right to request

review of the initial forfeiture determination and his right to review pertinent documents and

submit written comments. (*Id.* at ¶24.) Berg, through counsel, requested and received

14

documents relevant to his appeal.[5]  (*Id.* at ¶25.)  Berg also requested and received extensions of

time, ultimately receiving more than 120 days following the initial forfeiture determination to

submit documents, evidence, and arguments to the Committee.  (*Id.* at ¶26.)  On September 27,

2004, Berg submitted evidence and a position statement to the Committee.  (*Id.* at ¶27.)  On

October 22, 2004, the Plan followed suit.  (*Id.* at ¶28.)

On October 26, 2004, the Committee affirmed the Administrator's determination that

Berg's conduct met the standard for "Forfeiture of Benefits" under Section 2.9 and issued a

Notice of Adverse Benefit Determination on Review.  (*Id.* at ¶29.)  In that Notice, the Committee

informed Berg that it had determined that his conduct constituted embezzlement and grounds to

terminate Berg's employment "for cause," citing the seven examples of misconduct that the

Administrator had identified:

> The decision of the Appeals Committee is based on the following wrongful acts,
> individually as well as collectively, by Mr. Berg:
>
> (1) misleading BCS into paying him increased pension benefits inappropriately;
>
> (2) misleading BCS into improperly paying him in advance for an alleged supplemental
> 401(k) benefit;
>
> (3) failing to disclose to BCS or return the expense reimbursement for the Cress Creek
> Country Club building assessment when Cress Creek refunded it;
>
> (4) assisting Mr. Perillo in improperly obtaining and retaining the refund of his Cress
> Creek Country Club building assessment;
>
> (5) creating inaccurate and self-serving Minutes of the February 28, 2003 Board of
> Directors Meeting and submitting them for Mr. Baran's signature when he was leaving
> the board imminently so that the Minutes could not be reviewed and approved by the
> Board of Directors before execution;

---

[5]      Again, Berg disputes whether he received all relevant documents, but he does not
identify any particular documents that BCS or the Administrator allegedly withheld.

(6) directing subordinates not to include in BCS' 1999 and 2000 financial statements accruals for the unpaid portion of Mr. Perillo's three-year severance amount and Ms. Heller's one-year severance amount, which direction violated generally accepted accounting principles, without adequate disclosure to BCS' Audit Committee or outside auditors; and

(7) repeatedly failing to disclose conflicts of interest between his role as BCS's General Counsel and his attempts to increase his own compensation and benefits at the expense of BCS and obtain conflict waivers where necessary.

(R. 16-1, Admin. Record at FOR00001-02). In rendering the forfeiture determination, the Committee stated that it had considered all of the comments, documents, records, and other information, and applied the provisions of the Plan to Berg's benefits claims. (R. 32-1, Def.'s SMF at ¶30; R. 40-1, Pl.'s Resp. to Def.'s SMF at ¶30.)

## III. The Committee's Forfeiture Determination Was Not Arbitrary and Capricious

Here, Berg seeks review of the forfeiture determination on numerous grounds. First, Berg challenges the determination on procedural grounds, contending that the Committee (1) failed to discuss or address any of the evidence Berg submitted, (2) failed to describe its reasons for denial with specificity, and (3) failed to provide Berg all the relevant documents related to the initial benefit denials to properly prepare his appeals. Berg also argues that the Committee's determination was wrong as a matter of law because (a) it is improperly based on evidence acquired after the BCS Board properly agreed to allow Berg to resign for Good Reason and without Cause under his Employment Agreement; and (b) the alleged acts or omissions supporting the Committee's decision are factually incorrect. Finally, Berg argues that the administrative record does not support the Committee's factual determinations. As discussed below, the Court finds that the Committee was not arbitrary and capricious in finding forfeiture. Accordingly, the Court need not reach the merits of Berg's (now moot) appeal of the first

adverse determination wherein Berg objects to a reduction of benefits he ultimately lost in the second determination.

### A.    Berg's Procedural Arguments

Berg complains that the Notice of Adverse Benefits Determination did not allow full and fair review of his claim.  In particular, Berg asserts that there is no evidence that the Committee considered or reviewed the arguments Berg presented in his two requests for review.  "In fact, none of Berg's arguments were discussed or analyzed, much less specifically rebuked, in the Committee's determinations."  (R. 41-1, Pl.'s Opp. to Def.'s Mot. for Summ. J. at 3.)  Berg further asserts that "in challenging the Committee's decision here, Berg was left to guess which documents contained in the Administrative Record supported the Committee's various conclusions . . ."  (*Id.* at 4.)

Contrary to Berg's contention, ERISA does not require the Committee to discuss or analyze Berg's arguments.  As the Seventh Circuit has stated, "[t]he administrator must give the 'specific reasons' for the denial, but that is not the same thing as the reasoning behind the reasons, in this case the interpretive process that generated the reason for the denial." *Gallo*, 102 F.3d at 922 (citation omitted).  "All [the plan administrator] has to give the applicant is the reason for the denial of benefits; he does not have to explain to him why it is a *good* reason." *Id.* (citation omitted; emphasis original).  Here, the Plan provided the reasons (Berg was terminated for cause and/or embezzlement) and cited the specific sections of the SRP it relied upon in making its determination.  Under Seventh Circuit precedent, that is sufficient.

Berg also alleges that, despite numerous requests, he did not receive all of the documents relevant to the adverse benefits determinations.  Berg, however, submits only on a bald assertion

to that effect.  He fails to identify any specific documents that he requested and did not receive. (R. 34-1, Pl.'s SMF at ¶¶33, 46, 48 (asserting without factual support that Berg did not receive all documents relevant to his claims appeal); R. 40-1, Pl.'s Resp. to Def.'s SMF at ¶10; R. 35-1, Pl.'s Am. Mem. in Supp. of Summ. J. at 3 (citing the SMF ¶¶33, 46, 48 as purported support for Berg's position that the Administrator did not turn over all relevant documents).)  Moreover, based on his response to the Plan's statement of facts, it appears that Berg's real complaint is that the Plan did not explain the relevance of the documents it provided in response to Berg's requests.  (R. 45-1, Pl.'s Resp. to Def.'s SAMF at ¶3 ("Berg admits that he received numerous documents from the SRP and BCS in connection with his claim appeals, but states that the SRP and BCS failed to identify any of the documents or explain how they were relevant or supported the many conclusions raised by BCS in its adverse benefit determinations and the BCS Appeals Committee in its final benefits decisions on his claim appeals.").)  That argument, as just noted, fails.

### B.    After-Acquired Evidence

Berg argues that the Committee could not consider "after-acquired evidence" in rendering its adverse benefits determinations.  As Berg sees things, "BCS and the Committee violated Illinois law by attempting to convert Berg's retirement and termination without cause into a 'for cause' termination over one year after Berg's departure from BCS."  (R. 35-1, Pl.'s Am. Mem. in Supp. of Summ. J. at 6.)  "Neither the SRP nor Berg's Employment Agreement permit BCS or the SRP to redefine Berg's separation from service after the fact based on after-acquired evidence."  (R. 44-1, Pl.'s Reply in Supp. of Summ. J. at 1-2.)

At its core, the so-called "after-acquired evidence" doctrine operates when, after

terminating an employee, an employer learns that the employee engaged in conduct that would have provided a lawful basis upon which to terminate. *See von Pein v. Hedstrom Corp.*, No. 04 C 553, 2004 WL 1102317, *3-4 (N.D. Ill. May 4, 2004) (citing *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 357-58, 115 S. Ct. 879, 884, 130 L. Ed. 2d 852 (1995)). Under those circumstances, the "after-acquired evidence" cannot act as a complete bar to recovery to a wrongful discharge suit, but it can be admitted to limit the amount of back pay damages. *Id.* As the Supreme Court describes the policy underlying the limited use of "after-acquired evidence":

> The ADEA and Title VII share common substantive features and also a common purpose: the elimination of discrimination in the workplace . . . Deterrence is one object of these statutes. Compensation for injuries caused by the prohibited discrimination is another. . . It would not accord with this scheme if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the Act. . . .

> \*     \*     \*

> The object of compensation is to restore the employee to the position he or she would have been in absent the discrimination, but that principle is difficult to apply with precision where there is after-acquired evidence of wrongdoing that would have led to termination on legitimate grounds had the employer known about it. Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.

*McKennon*, 513 U.S. at 358-61, 115 S. Ct. at 884-86, 130 L. Ed. 2d at 861-63 (citation and quotation omitted). Where applicable, the "after-acquired evidence" doctrine would limit damages from the moment the employer discovered the wrongdoing going forward. *Dvorak v. Mostardi Platt Associates, Inc.*, 289 F.3d 479, 485-86 (7th Cir. 2002).

In support of his position, Berg cites only *Von Pein*, 2004 WL 1102317 at *3-4. (R. 35-1, Pl.'s Mem. in Supp. of Summ. J at 6-7.) *Von Pein*, however, considered whether the after-

acquired evidence doctrine is relevant to the breach of an employment agreement, not an ERISA

plan such as that here.  Berg fails to offer any reason why the Court should extend *Von Pein*

beyond the specific facts of that case.

In any event, the Court agrees with the conclusion in *Argenbright v. Zix Corp.*, which

held to the contrary:

> [The] reasoning [underlying the after-acquired evidence doctrine] is inapplicable outside
> a discrimination context where there is no wrong to be remedied other than the denial of
> benefits.  In the ERISA context, the issue is whether Plaintiff is properly entitled to
> benefits:  a determination which does not require an analysis into the employer's
> motivations.

No. Civ. 3:04-CV-1061-H, 2005 WL 1421775, *3 (N.D. Tex. June 14, 2005) ("[i]n the ERISA

context, the 'after-acquired' evidence doctrine serves to establish a Plaintiff's unworthiness to

receive benefits under the Plan . . .").  Put another way, the Supreme Court limited the use of

after-acquired evidence to ensure that, consistent with the goals of Title VII and the ADEA, an

employer who acted with discriminatory animus would not be free from liability if, after the fact,

the employer discovers a legitimate reason for termination.  Those policy concerns are not at

issue here.  Accordingly, the after-acquired evidence doctrine does not limit the evidence that the

Committee could consider in reviewing Berg's claim.

**C.**     **The Committee Had the Authority To Determine that Berg Met the
          Standard for Forfeiture**

Berg next contends that the Committee lacked authority to forfeit his benefits under

Section 2.9.  Specifically, Berg asserts that "[t]he plain terms of SRP Section 2.9 permit the

SRP's Administrator to forfeit a Participant's SRP benefits *only* if he or she is

*contemporaneously* discharged or terminated from employment with BCS for acts recognized at

termination as embezzlement or 'for cause.'"  (R.  44-1, Pl.'s Reply in Supp. of Summ. J. at 4

(emphasis original); R. 41-1, Pl.'s Opp. to Def.'s Mot. for Summ. J. at 5 (same).) Berg contends that he does not satisfy Section 2.9 because he "was neither discharged *from employment* with BCS for embezzlement nor terminated *from employment* with BCS for cause." (R. 44-1, Pl.'s Reply in Supp. of Summ. J. at 3.) Berg premises his contention on the claim that "[i]t is undisputed that BCS' Board of Directors and Executive Committee unanimously voted effective March 31, 2003 to trigger Berg's Employment Agreement as a 'resignation for good reason and a termination by BCS Financial without cause. . .'" (R. 35-1, Pl.'s Am. Mem. in Supp. of Summ. J. at 6-7; R. 41-1 Pl.'s Resp. to Def.'s Mot. for Summ. J. at 6 (same); R. 44-1, Pl.'s Reply in Supp. of Summ. J. at 1, 4.) Berg's argument is unavailing.

For starters, Berg's premise is untrue. The administrative record reflects that the Plan did in fact dispute the terms of Berg's departure. Indeed, the Administrator submitted Ryan's version of the February 28 minutes to the Committee. Those minutes provide evidence that, at the time of his departure, BCS had not classified Berg's termination one way or the other.[6] (R. 16-1, Admin. Record at FOR00297-99 (Ryan's version of the February 28 meeting minutes indicating that the Board expressly reserved that determination for a later date).) The record further indicates that BCS later deemed Berg's departure as a "termination for cause," thereby leaving to the Administrator's sole discretion (under SRP Section 2.9) whether "the circumstances surrounding [the] dismissal are such that . . . forfeiture of the benefit . . . is

_____

[6] Berg also argues that the record supports the conclusion that he was terminated without cause because upon departure he received benefits payments for one year. Ryan's version of the minutes, however, provides a reasonable basis for the Committee to conclude otherwise, *i.e.* that Berg was to receive ratable benefits payments until the company finished investigating the circumstances surrounding his departure. (R. 16-1, Admin. Record at FOR00297.)

warranted." (*Id.* at FOR00201 ¶2.9, FOR00217 (May 26, 2004 letter from BCS whereby Berg received notice that "based on facts identified during its investigation of [Berg's] compensation and benefits, BCS Financial Corporation . . . has concluded that your conduct meets the standards for "Forfeiture of Benefits" under Section 2.9 of the [SRP] . . . Accordingly, BCS has terminated all future payments that were to be made to you under the SRP.").)

To no avail, Berg does not address this evidence, choosing instead to point only to the evidence he submitted to the Committee.[7] In doing so, Berg, in effect, asks the Court to reweigh conflicting evidence in the record – something the Court cannot do under deferential review. *See Militello v. Central States Southeast & Southwest Areas Pension Fund*, 209 F. Supp. 2d 923, 931 (N.D. Ill. 2002) (citing *Exbom v. Central States, S.E. and S. W. Areas Health and Welfare Fund*, 900 F.2d 1138, 1144 (7th Cir. 1990) ("arguments about the sufficiency of the evidence cannot demonstrate arbitrariness or capriciousness where there is evidence in the record that supports the plan administrator's reasons" – a court "cannot reweigh the evidence where the record supports the Fund's decision as reasonable").

In any event, the SRP Section 2.9 does not expressly require BCS or the Administrator to make a "contemporaneous" determination that Berg was terminated for cause. (R. 16-1, Admin. Record at FOR00201 ¶2.9 (forfeiture shall occur if "the Participant's Employment terminates by dismissal for cause and the circumstances surrounding such dismissal are such that the Administrator, in its sole discretion, determines that forfeiture of the benefit otherwise payable

---

[7]         Berg claims that, on this issue, the Plan "offers a novel argument, which was not listed in the Committee's final benefit determination – that Berg was in fact terminated from employment for cause. This argument should be disregarded [ ] because it was not offered during the claims review process . . ." (R. 44-1, Pl.'s Reply in Supp. of Summ. J. at 2.) Berg's argument runs contrary to Seventh Circuit precedent. *See Gallo*, 102 F.3d at 923.

under the Supplemental Program is warranted").)  The rest of the SRP likewise is silent on this

issue.  Because the administrator retains discretion under Section 3.2 to interpret the SRP's terms

the SRP administrator could classify Berg's termination "for Cause" after his departure from

BCS.  *Gallo*, 102 F.3d at 922 ("When as in this case the plan document does not furnish the

answer to the question, the answer given by the plan administrator, when the plan vests him with

discretion to interpret it, will ordinarily bind the court.  That is implicit in the idea of deferential

review of the plan administrator's interpretation.").  To find otherwise, as the Plan points out,

would allow wrongdoers to collect benefits in perpetuity so long as they could successfully cover

their tracks until after they left BCS.[8]

---

[8]        Even though the SRP does not expressly incorporate the terms of the Employment
Agreement, Berg argues that the Committee was restricted to using the Employment
Agreement's definition of termination "for Cause."  (R. 35-1, Pl.'s Am. Mem. in Supp. of
Summ. J. at 8 ("the Committee erred by failing to apply the terms [of] Berg's Employment
Agreement to determine whether he was 'discharged' for cause . . . . Rather than utilizing the
definition of 'for cause' applicable to Berg's employment, the Committee and BCS created their
own, self-serving definition to terminate Berg's benefits.  The Committee should have applied [ ]
Section 6(c) of Berg's Employment Agreement. . .").)  Certainly, it would have been reasonable
for the Committee to have used that definition.  But other reasonable alternatives exist,
especially because, as the Plan points out, "only a small percentage of the participants (the Plan
was established in 1990) ever had employment contracts and the Plan was drafted eight years
before Berg's contract."  (R. 36-1, Def.'s Resp. at 9 (parentheses original).)  The Administrator
had discretion under SRP Sections 3.2 and 2.9 to interpret the phrase "termination for cause" and
could construe it freely so long as the Administrator did not ascribe an unusual meaning.  *See
Morton v. Smith*, 91 F.3d 867, 871 (7th Cir. 1996) ("[w]hen the administrators of a plan have
discretionary authority to construe the plan, they have the discretion to determine the intended
meaning of the plan's terms" – "[w]hen a common, ordinary word with multiple meanings
appears in a plan, it must be construed.  A trustee with the discretion to construe generally is not
prevented from construing such a word; he or she is only prevented from giving that word an
uncommon, extraordinary meaning").

        Even if the Committee had applied the Employment Agreement's definition of
termination for cause as Berg urges, the Committee nonetheless could have reasonably
determined that forfeiture was warranted.  The administrative record contained sufficient
evidence from which the Committee could conclude that Berg created false meeting minutes,

### D. The Administrative Record Supports the Committee's Determination

Having determined that the Administrator was within its authority to deny Berg benefits, the Court now turns to whether the Committee was arbitrary and capricious in determining that the circumstances surrounding Berg's departure warranted forfeiture of benefits. As noted above, the Committee identified numerous reasons justifying its determination that the circumstances surrounding Berg's departure justified benefits forfeiture. Berg argues that none finds support in the administrative record. The Court, however, need only address the biggest foul among those identified – that Berg mislead BCS into increasing his benefits – because that misconduct alone is sufficient to warrant forfeiture under Section 2.9. (R. 16-1, Admin. Record at FOR00002 ("The [forfeiture] decision of the Appeals Committee is based on the following wrongful acts, *individually as well as collectively*, by Mr. Berg . . .") (emphasis added).)

The Plan contends that Berg misled BCS in order to receive excess retirement benefits from the Plan for more than a year from April 1, 2003 until after the May 24, 2004 decision. (R. 30-1, Def.'s Mem. in Supp. of Summ. J. at 9.) In particular, the Plan asserts that, without proper authorization, Berg prepared a Retirement Notice directing the Plan to pay him retirement benefits without applying the social security offset and early retirement reduction provisions. (*Id.*) The Plan further asserts that Berg tried to "lock-in" his artificially enhanced benefits by drafting minutes (for a meeting he did not attend) that stated the Board had approved his resignation for Good Reason and termination without cause. (R. 36-1, Def.'s Resp. to Pl.'s Mot.

_____

thereby satisfying the Employment Agreement's definition of termination for cause. (R. 16-1, Admin. Record at FOR00039-40 (under the Employment Agreement, Berg could be terminated with cause for falsifying records).) In addition, Berg's argument rests on facts that, strictly speaking, relate only to the Board's determination regarding how his departure would be classified for purposes of the Employment Agreement, not the SRP.

for Summ. J. at 12.)  In response, Berg contends that:  (1) Baran approved the enhancement to

Berg's retirement benefits in writing, and (2) that Baran had the unilateral authority to do so.  (R.

41-1, Pl.'s Resp. to Def.'s Mot. for Summ. J. at 8-9; R. 34-1, Pl.'s SMF at ¶¶54-61.)  In the main,

Berg rests his contentions on his own affidavit and the transmittal letter described above.[9]  (R.

34-1, Pl.'s SMF at ¶¶54-61.)  Berg further submits that "[t]here is no credible factual evidence to

support this basis of the Committee's determination that Baran was misled by Berg. . ."  (R. 35-

1, Pl.'s Am. Mem. in Supp. of Summ. J. at 10.)[10]  The Court rejects Berg's argument.

Foremost, Berg fails to address strong evidence in the administrative record

demonstrating that Baran did not have the authority to or intention of unilaterally increasing

Berg's benefits.  Most notably, Berg sidesteps Baran's affidavit which squarely undercuts the

premise of Berg's argument:

> During the months of January and February 2003, I had conversations with Mr. Berg
> regarding the terms of his Employment Agreement and his request for additional
> enhancements to his retirement benefits.  I informed Mr. Berg that since I too was leaving
> BCS I was not authorized to (and therefore would not) change the terms of his
> Employment Agreement or increase his retirement benefits from whatever BCS already
> was required to pay him and that if he wanted changes, he should discuss them with Jim
> Mead, Vice Chairman of BCS's Board of Directors.

---

[9]     Berg also relies on BCS's Annual Incentive Compensation Plan, effective January
1, 1997 as evidence that Baran "unilaterally adjusted the annual award for Ryan in the mid-
1990s."  (R. 34-1, Pl.'s SMF at ¶57.)  Contrary to Berg's contention, that document does not
indicate whether Baran in fact adjusted Ryan's benefits.

[10]     In a supplemental submission, Berg urges the Court to consider the deposition
testimony of Baran taken on October 18, 2005 in a state court case involving BCS as a party.
Berg asserts that Baran's deposition testimony contradicts certain statements in Baran's affidavit
and further demonstrates that Baran made other statements without personal knowledge.  Baran's
deposition testimony, however, is not part of the administrative record and thus the Court cannot
consider it here.  *See Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative
decision means review on the administrative record").

Mr. Berg did contact Mr. Mead directly but I do not believe that BCS approved any change in Mr. Berg's Employment Agreement or retirement benefits during the months of January or February 2003. During that time, Mr. Berg presented several documents for my signature and I signed or initialed the documents he presented to me based upon his advice that my approval was required to carry out BCS' preexisting obligations. In so doing, I did not intend to increase BCS' obligations under Mr. Berg's Employment Agreement or the SRP and question whether any one person even had that authority under the circumstances.

On or about February 28, 2003, Mr. Berg presented me with a transmittal letter to [the SRP administrator] for retirement notices relating to his and my retirement that I signed. I assumed that Mr. Berg's notice contained accurate directions regarding Mr. Berg's retirement benefits because I relied upon Mr. Berg as BCS' General Counsel and the executive with responsibility for, and expertise in, calculating benefits under BCS' various employment agreements and retirement programs. I did not intend to modify or amend BCS' retirement programs or increase Mr. Berg's retirement benefits by signing the transmittal letter.

(R. 16-1, Admin. Record FOR00283-84, ¶¶6-8.) Again, Berg's evidence that Baran could

exercise unilateral authority comes from Berg's own affidavit.[11]

---

[11]     Berg's objection regarding the supplemental matching benefit (the second basis for the Committee's forfeiture determination) suffers from the same deficiency: dueling affidavits that the Court cannot re-evaluate here. The Plan asserts that Berg misled BCS into paying him $73,226 during 2003 for a non-existent supplemental matching benefit. (R. 30-1, Def.'s Mem. in Supp. of Summ. J. at 10 (citing FOR00130-31, FOR00363-65).) In response, Berg argues that, in 1994, Baran authorized an SRP amendment that established a supplemental 401(k) benefit. Yet Baran, in his affidavit, states that he did not unilaterally authorize a supplemental matching benefit:

> I do not believe BCS' Board of Directors or Executive Committee ever approved a supplemental 401(k) benefit. To my knowledge, no such benefit was ever implemented while I was at BCS. Apart from Mr. Berg, I know of no employee (including myself) that ever claimed or received any supplemental 401(k) benefit. Also, BCS never viewed a supplemental 401(k) benefit as a SRP obligation as evidenced by the fact that, since 1994, BCS followed a policy of funding its SRP obligations annually by means of deposits in a "rabbi trust" but never funded any supplemental 401(k) benefits during my years at BCS.

(R. 16-1, Admin. Record at FOR00284.) The administrative record provides reasonable support for the Committee's finding on this issue as well.

Moreover, Berg's conduct itself appears to belie his assertion that Baran could act unilaterally.  For example, in his February 5, 2003 letter to Jed Pitcher, a BCS director, Berg effectively concedes that he needed additional authorization to enhance his benefits:

> [Baran] seems confident that since he has discussed with everyone on the Committee the matter of my contract pay-out and enhanced retirement benefit, the matter will be finalized at Monday's meeting so that he can implement the details to facilitate my departure from BCS as of March 1.  While I genuinely hope that he is right in that he expects no further approvals will be necessary beyond Monday, I do request your assistance in having the Committee finalize these matters on Monday.  As we have discussed, I would respectfully request this to be completed on Monday for the following reasons . . .  Since the Executive Committee and [Baran] have been the sole authority on compensation issues for the last 15-plus years ([Baran's] time here), and in that time the Board has not, on a single occasion, dealt with a compensation issue, I have difficulty understanding why the Executive Committee cannot be the final authority on these issues related to the end of my employment . . .

(R. 15-1, Admin. Record at RED000450-51.)  Earlier, Berg had written a letter to Mead much to the same effect.  (*Id.* at RED00446.)

The record further supports the conclusion that Berg drafted corporate minutes (for a meeting he did not attend) with an eye toward "locking in" his enhanced benefits.  On this issue, Berg contends that the Plan "has not and cannot prove that Ryan's version of the Board minutes is an accurate account of what actually took place at the meeting or was validly approved by BCS's Board."  (R. 44-1, Pl.'s Reply in Supp. of Summ. J. at 6.)  Berg, however, cannot attest to the accuracy of his own version of the minutes:

> My resignation and termination were approved by BCS' Board of Directors at a February 28, 2003 meeting.  I did not attend the February 28, 2003 meeting, but was requested by [Baran] to draft the corporate minutes for the meeting based on Mr. Baran's notes from the meeting, which Mr. Baran attended . . . Because I did not attend BCS' February 28, 2003 meeting, I do not know whether or not Mr. Baran's notes accurately reflected the discussions at the meeting . . .

(R. 16-1, Admin. Record at FOR00091-92 (Berg's affidavit).)  Accordingly, the Committee

could, within reason, determine Ryan's version of the minutes was accurate and that Berg's draft to the contrary demonstrated an improper effort to artificially enhance his benefits.

In addition, the financial effect of Berg's benefits enhancement is significant. In the months preceding his departure, Berg requested that the SRP administrator calculate the financial impact of eliminating the social security offset and early retirement reduction from his retirement benefits. (R. 38-1, Def.'s SAMF at ¶21.)[12] The Administrator determined that the then-current net present value of eliminating the social security offset and early retirement reduction was approximately $400,000. (*Id.* at ¶22.)

Taken together, the record evidence supports the Committee's determination that Berg's conduct warranted forfeiture. Simply put, the Committee could reasonably conclude that Berg misled BCS into paying significantly higher benefits when the person (Baran) who supposedly authorized the enhancement stated unequivocally that he did not intend or attempt to do so. Berg's argument to the contrary essentially asks the Court to reweigh the evidence in the administrative record – something the Court cannot do when reviewing under the arbitrary and capricious standard.

---

[12] In his response to the Plan's SAMF, Berg denies he made such requests to the SRP Administrator and further argues that the Court cannot consider these documents on summary judgment because they are hearsay and not properly authenticated. Berg's argument is misplaced. An ERISA administrator is not bound by the rules of evidence. *See Karr v. National Asbestos Workers Pension Fund*, 150 F.3d 812, 814 (7th Cir. 1998) ("A pension or welfare fund trustee or administrator is not a court. It is not bound by the rules of evidence."). Thus, the Committee properly could rely on these documents in rendering its determination.

**CONCLUSION**

For these reasons, the Court grants the Plan's motion for summary judgment and denies

Berg's motion for summary judgment.


Dated: February 2, 2006                                    ENTERED



_____
AMY J. ST. EVE
United States District Judge